## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH), 20 Black Brook Road Aquinnah, MA 02535, | ) ) ) ) ) |
| *Plaintiff*, | ) ) |  Civil Action No. |
| v. | ) ) ) |
| MICHAEL R. BROMWICH, in his official capacity as Director of the Bureau of Ocean Energy Management, Regulation and Enforcement United States Department of the Interior 1849 C Street, NW Washington, DC 20240, | ) ) ) ) ) ) ) ) |
| THE HONORABLE KENNETH SALAZAR, in his official capacity as Secretary of the Interior United States Department of the Interior 1849 C Street, NW Washington, DC 20240, | ) ) ) ) ) ) |
| BUREAU OF OCEAN ENERGY MANAGEMENT, REGULATION AND ENFORCEMENT (f/k/a MINERALS MANAGEMENT SERVICE) United States Department of the Interior 1849 C Street, NW Washington, DC 20240, | ) ) ) ) ) ) ) |
| *Defendants*. | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## NATURE OF ACTION

1.  This action challenges the authorization of the Cape Wind Energy Project by the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") and Secretary of the U.S. Department of the Interior Kenneth Salazar ("Secretary Salazar") on the grounds that this authorization violates the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, the National Historic Preservation Act, 16 U.S.C. §§ 470 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

2.  On April 28, 2011, BOEMRE issued a Record of Decision authorizing Cape Wind Associates, LLC to install and operate 130 wind turbine generators and other supporting equipment within a 46-square-mile area on or near Horseshoe Shoal in Nantucket Sound, approximately 3.5 miles off the coast of Massachusetts.

3.  The Cape Wind Energy Project (the "Project") will alter the eastern viewshed across Nantucket Sound, which is central to the identity and religion of the Wampanoag Tribe of Gay Head (Aquinnah) (the "Tribe"). The Project will also irreparably damage the seabed of Horseshoe Shoal, which holds cultural and historical significance for the Tribe.

4.  The construction and operation of the Project will make the Tribe's cultural heritage, spiritual ceremonies, and day-to-day practices, such as subsistence fishing off the coast of Martha's Vineyard, nearly impossible and will irreparably intrude into sites of cultural and spiritual significance that the Tribe wishes to remain undisturbed.

5.  BOEMRE and Secretary Salazar authorized this Project without adequately considering and analyzing the adverse impacts to the Tribe's cultural and historic resources, including the irreparable harm to Horseshoe Shoal, and without conducting meaningful

consultation with the Tribe regarding these adverse impacts, in violation of their duties under the National Environmental Policy Act and the National Historic Preservation Act.

## JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. § 1331 because it arises under the laws of the United States, including the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*; the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.*; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

7. Venue is proper in this Court under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703 because a substantial part of the events and omissions giving rise to this claim occurred within this judicial district and Defendants have offices in this district.

## THE PARTIES AND STANDING

8. The Plaintiff is the Wampanoag Tribe of Gay Head (Aquinnah). The Tribe has been a federally recognized Indian tribe since 1987.

9. The Tribe's reservation consists of approximately 482 acres and is located on the western part of the island of Martha's Vineyard, Massachusetts. The Tribe has approximately 1100 members, of whom 68 live on the Tribe's reservation in the town of Aquinnah and 298 live in Dukes County on Martha's Vineyard within the Tribe's service area, where the Tribe provides financial assistance and social services programs to its members within the meaning of 25 C.F.R. § 20.100.

10. The Tribe is governed by a popularly elected Tribal Council. The eleven-member council includes a Chairperson, Vice-Chairperson, Secretary, and Treasurer.

11. On or about July 5, 2011, the Tribal Council voted to authorize this suit to be brought on behalf of the Tribe and as *parens patriae* on behalf of all individual tribal members.

12. Tribal Resolution 2004-06 established the Tribe's Cultural and Historic Commission and authorized this Commission to take measures to protect and preserve the Tribe's cultural resources.

13. The Tribe has lived on the shores of Nantucket Sound since time immemorial.

14. The Tribe depends on Nantucket Sound for food, jobs, spiritual ceremonies, and cultural continuity, and the Sound is essential to the Tribe's religious ceremonies and traditional religious practices.

15. The Project will result in the construction and operation of 130 wind turbine generators on a 46-square-mile area on or near Horseshoe Shoal in Nantucket Sound, approximately twenty-four miles from the Tribe's reservation.

16. The Tribe has participated in the public proceedings relating to the Project, its authorization, and the required analyses under federal law.

17. The Tribe has maintained throughout the public process that the Project will injure both the Tribe and its individual members because Nantucket Sound is a defining aspect of the Tribe and is an essential component of their customary and traditional religious practices.

18. The Project will harm the Tribe's religious, cultural, and economic interests by degrading the Nantucket Sound ecosystem and, in particular, disturbing the currently unblemished view of the eastern horizon, both of which are of immense spiritual importance to the Tribe; by disrupting or preventing fishing on Horseshoe Shoal as a source of sustenance, subsistence, and income for individual tribe members; and by disturbing the sea bed, which

4

may result in irreparable damage to historically significant and culturally and spiritually important archaeological resources.

19. Defendants' 2011 Record of Decision ("2011 ROD") approving the February 2011 Construction and Operations Plan ("COP") for the Project causes harm to the Tribe because the 2011 ROD authorizes the construction and operation of the Project.

20. Revocation of the COP's approval will redress the Tribe's injury.  The harm will not occur if the COP's authorization is revoked and not re-issued because the Project cannot be constructed and operated without authorization of the COP.

21. The Defendants are Michael R. Bromwich, Director of BOEMRE, Kenneth Salazar, Secretary of the U.S. Department of the Interior, and BOEMRE (collectively "Defendants").

22. Defendant BOEMRE is a federal agency within the U.S. Department of the Interior. BOEMRE is the successor name of the Mineral Management Service.  Secretary Salazar enacted the name change by order dated June 18, 2010.

23. BOEMRE is charged with management of resource and energy development on the Outer Continental Shelf, including the granting and overseeing of leases for the use of public lands on the Outer Continental Shelf and the authorization of construction and operations plans for such projects.

24. BOEMRE conducted an environmental review of the Project under NEPA and the Section 106 review under NHPA and issued a ROD approving the COP that allows Cape Wind Associates to go forward with the Project.

25. BOEMRE's headquarters are in Washington, D.C.  All decisions relating to the Project were issued from this office.

26. Defendant Michael Bromwich is the Director of BOEMRE and is sued in his official capacity.

27. Director Bromwich is charged with the supervision and management of all BOEMRE decisions and actions.

28. The Director's office is in the BOEMRE headquarters in Washington D.C.

29. Defendant Kenneth Salazar is the Secretary of the U.S. Department of the Interior and is sued in his official capacity.

30. Secretary Salazar is charged with the supervision and management of all U.S. Department of the Interior decisions.

31. Secretary Salazar's office is located in the U.S. Department of the Interior headquarters in Washington, D.C.

## FACTUAL BACKGROUND

### The Tribe's Historical and Culturally Significant Use of Nantucket Sound

32. The Wampanoag are "The People of the First Light" for whom a clear, unobstructed view of the rising sun across Nantucket Sound is essential to the proper conduct of their religious ceremonies and practices, up to the present day.

33. The Tribe has continuously engaged in its traditional and customary religious practices, in main part by conducting essential religious ceremonies at dawn, as the sun rises over the horizon across Nantucket Sound's waters.

34. The historic and continuing use of this eastern view is a significant identifying aspect of the Tribe.

35. Nantucket Sound and its landforms bear significant relation to "Moshop," a cultural hero for the Tribe. Oral history of the story of Moshop, his relationship to the Tribe, and his

6

creation of the Sound and its associated islands have spanned many generations and are an integral part of Wampanoag culture. Such stories are a key part of the Tribe's cultural identification as a distinct Indian people.

36. Horseshoe Shoal has been a primary source of subsistence and sustenance-based fishing for the Tribe, both historically and in the present day.

37. Nantucket Sound was originally a large, primarily dry-land coastal plain, and the Tribe occupied most or all of this plain as far back as 13,000 years ago.

38. Nantucket Sound, including, but not limited to, Horseshoe Shoal, is likely to contain submerged archaeological sites related to the history of the Tribe.

39. The Tribe has repeatedly and publicly stated that it considers Horseshoe Shoal to be a traditionally and culturally significant site or place and that, in the words of the current Tribal Chairwoman, the Tribe holds "the Eastern Vistas, Horizon, and Terrestrial Sky over that same water body in the highest Religious, Spiritual, Cultural and Traditional Esteem."

**Timeline of Project**

40. In November 2001, Cape Wind Associates applied for a permit from the U.S. Army Corps of Engineers (the "Corps") under the Rivers and Harbors Act of 1899 to construct an offshore wind power facility on Horseshoe Shoal.

41. In July 2004, the Corps issued a draft Programmatic Agreement to govern the resolution of the Project's adverse effects on historic properties. The Corps requested that the Massachusetts Historical Commission comment on the draft.

42. The Massachusetts Historical Commission responded by letter dated August 11, 2004, expressing concern that "the draft Programmatic Agreement does not include provisions for public comment or language that adequately describes a meaningful consideration of

alternatives to the preferred alternative that would avoid, minimize, or mitigate the effects of the proposed project."

43. On November 9, 2004, the Corps issued a Draft Environmental Impact Statement ("EIS") for the Project enumerating sixteen historic properties in the viewshed of the Project that would suffer adverse visual impacts; each of these properties had been previously listed or determined eligible for listing in the National Register of Historic Places ("National Register").

44. Also, on November 9, 2004, the Tribal Historic Preservation Officer ("THPO") of the Tribe wrote a letter to the Corps asserting the cultural and spiritual significance of Horseshoe Shoal and the need for more surveys to identify potential adverse impacts on the Tribe's cultural resources.

45. The Tribe submitted comments on the Corps' Draft EIS on November 19, 2004. In the comments, the Tribe opposed the Project's proposed location, objected to the Corps' providing insufficient time for comment, disagreed with the Corps' "Finding of No Effect" of the Project on cultural resources, and requested that the Corps engage with the Tribe in formal government-to-government consultation.

46. In July 2005, Congress passed, and the President signed into law, the Energy Policy Act of 2005, which transferred responsibility for offshore alternative energy development projects from the Corps to BOEMRE.

47. On May 30, 2006, BOEMRE published a Notice of Intent to prepare an EIS on the Project and offered an opportunity for public comment as to the scope of the EIS. During this initial scoping phase, the public and agency identify the environmental issues implicated in a project and define the alternatives to be examined.

48. BOEMRE originally set the deadline for public scoping comments as July 14, 2006 but subsequently extended the comment period to July 28, 2006.

49. On July 26, 2006, the Tribe submitted written comments to BOEMRE expressing concerns regarding the Project, including its effects on the Tribe's religious and cultural practices and the aquatic ecosystem.

50. In its comments on the scope of the EIS, the Tribe posed a number of questions to BOEMRE and requested that BOEMRE engage in formal government-to-government consultation with the Tribe.

51. BOEMRE wrote to various stakeholders and consulting parties on January 15, 2008, expressing its intent to complete consultation under Section 106 of NHPA before issuing a ROD on the Project, but noting that it was not under any obligation to do so.

52. On January 18, 2008, BOEMRE publicly noticed its Draft EIS and provided for a sixty-day public comment period.

53. BOEMRE subsequently extended the comment period an additional thirty days to April 21, 2008.

54. BOEMRE held four public meetings on the Draft EIS, on March 10, 11, 12, and 13, 2008.

55. Even though BOEMRE reinitiated the NEPA analysis begun by the Corps, BOEMRE stated that it considered all public comments submitted or expressed during public meetings on the Corps' Draft EIS as scoping comments for BOEMRE's Draft EIS.

56. In its Draft EIS, BOEMRE evaluated in detail two alternative geographic locations, three non-geographic alternatives, the proposed action, and the no action alternative.

57. The geographic alternatives include Monomoy Shoals and an area South of Tuckernuck Island.

58. The non-geographic alternatives include a smaller alternative, which would consist of half the number of wind turbine generators as the proposed project and correspondingly less visual impact and seabed disturbance; a phased development alternative; and a condensed-array alternative, which would locate the turbines closer together and reduce the overall project area by nine square miles, but not reduce the visual impact of the Project from Martha's Vineyard.

59. At the March 12, 2008 BOEMRE public meeting on the Draft EIS, the Tribe's Chairwoman stated the Tribe's opposition to the siting of the Project on Horseshoe Shoal and expressed concern that the Draft EIS diminishes and dismisses the Tribe's cultural concerns. The Chairwoman enumerated the archeological and cultural significance of Horseshoe Shoal as formerly inhabited dry land and reiterated the vital significance of the eastern view of the horizon as essential to the Tribe's identity.

60. The Tribe's Chairwoman spoke at another Draft EIS public meeting the following day, quoting a February 14, 2008 resolution of United South and Eastern Tribes, Inc., an intertribal organization representing twenty-five federally recognized tribes, which called on the Department of the Interior to deny the permit. She also cited the illegality and inadequacy of the Draft EIS with regard to its analysis and treatment of the adverse effects of the Project's location on the Tribe's cultural practices and history.

61. On April 17, 2008, the Tribe filed formal comments on the Draft EIS with BOEMRE. The Tribe's comments concluded that the Draft EIS' treatment of native people and their concerns was "wholly inadequate."

62. BOEMRE conducted its initial Section 106 consultation meeting for the Project on July 23, 2008, in Boston, Massachusetts.  BOEMRE invited fifteen consulting parties; BOEMRE is required to involve these parties in the findings and determinations made during the Section 106 process.

63. On September 8, 2008, BOEMRE Project Manager met with the Tribe and briefly viewed several important ceremonial sites both on the shore of Cape Cod and on Martha's Vineyard.

64. At the September 8, 2008 meeting, the Tribe described the sacred nature of these sites and their critical role in the conduct of the Tribe's most sacred religious ceremonies and practices, and explained that Horseshoe Shoal had been a village and burial site during the last ice age and, thus, was of great importance to the Tribe.

65. The Tribe's Chairwoman wrote to BOEMRE on December 2, 2008, expressing various concerns, including that BOEMRE had not responded to the Tribe's letter of April 17, 2008, seven months prior; that a proposed stakeholders' meeting had been canceled; that a public meeting of various stakeholders would not fulfill BOEMRE's legal obligations to the Tribe; and that far too little formal government-to-government consultation with the Tribe had occurred.

66. On December 9, 2008, the Tribe submitted a letter to BOEMRE urging that the agency not issue a Final EIS because it had not completed the Section 106 process or conducted adequate formal government-to-government consultation with the Tribe.

67. The Tribe also wrote to the Advisory Council on Historic Preservation ("ACHP"), an independent federal agency created by NHPA that promotes the preservation, enhancement, and productive use of our nation's historic resources.   The Tribe asked that the ACHP

intercede with BOEMRE on the Tribe's behalf, in an effort to ensure that BOEMRE comply

with Section 106 and fulfill formal government-to-government consultation requirements.

68. On December 17, 2008, the ACHP wrote to BOEMRE urging full compliance with

Section 106 consultation requirements. Even though BOEMRE had already issued its Draft

EIS selecting Horseshoe Shoal as the Preferred Alternative, the ACHP noted:

> Following review of materials available to us, the Section 106
> process for this undertaking appears to be still at the stage of
> identification of historic properties that might be affected by the
> undertaking . . . Notwithstanding the information presented in the
> [Draft] EIS, [BOEMRE] has yet to formally document its [Area of
> Potential Effect] to the Massachusetts [State Historic Preservation
> Officer] and other consulting parties, and identify historic
> properties within that [Area of Potential Effect] that might be
> affected by the undertaking.

69. BOEMRE issued a Documentation of Section 106 Finding of Adverse Effect on

December 29, 2008, determining that a total of twenty-nine historic properties would be

adversely affected, including one property of traditional religious and cultural importance

("Traditional Cultural Property") to the Tribe.

70. On December 29, 2008, BOEMRE notified various stakeholders and consulting

parties of the finding and stated its intent to continue consultation under Section 106 in order to

"avoid, minimize, or mitigate" these adverse effects.

71. Three weeks after issuing the Finding of Adverse Effect, BOEMRE publicly

noticed the availability of the Final EIS on January 21, 2009.

72. The Final EIS selected Horseshoe Shoal as the preferred location for the Project and

acknowledged:

> [T]he proposed project will have an adverse visual effect for the
> 25-year life of the project on twenty-eight above-ground historic
> properties, and will impact the traditional religious and ceremonial
> practices of the Gay Head/Aquinnah and Mashpee Wampanoag

> Tribes, including visual intrusion into one specific sacred historical
> site identified to [BOEMRE] by the Tribes.

73. The Final EIS concluded that construction impacts on cultural resources would be "minor" and did not evaluate or propose mitigation of the adverse effect to the historic property identified by the Tribe.

74. On January 29, 2009, BOEMRE conducted a second full Section 106 consultation meeting. A representative of the Tribe attended and read a statement that noted that the Tribe continued to feel ignored and disrespected by BOEMRE.

75. On February 6, 2009, the Executive Director of the Massachusetts Historical Commission, who serves as the State Historic Preservation Officer ("SHPO") for purposes of Section 106 consultation, wrote to BOEMRE, noting that the documentation BOEMRE had compiled was "incomplete and insufficient" and encouraging BOEMRE to continue formal government-to-government consultation with the Tribe to ensure that BOEMRE conducted an adequate evaluation of Traditional Cultural Properties as well as alternatives to mitigate adverse effects to these properties.

76. On March 19, 2009, the Tribe's Chairwoman wrote to the newly confirmed Secretary Salazar, urging his personal involvement in the pending actions of BOEMRE. Referring to Nantucket Sound, the letter states:

> The area in question is one of if not the most significant
> Traditional Cultural Properties of our Nation. We, the
> Wampanoag are "The People of the First Light." . . . We have
> repeatedly requested [BOEMRE] to engage in true and meaningful
> Government to Government consultation. . . . [BOEMRE] has not
> upheld their federal responsibility under these laws, nor have they
> answered the plethora of questions we have asked regarding their
> review and evaluation process and our additional contemporary
> issues.

77. On April 1, 2009, the ACHP again wrote to BOEMRE, noting that "as a result of the issuance of a 'Finding of Adverse Effect' on December 29, 2008, [BOEMRE] is now formally consulting to resolve adverse effects that may result from the proposed Project. Pursuant to 36 C.F.R. § 800.6, this consultation should address alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects." The ACHP further noted that ". . . the Finding is incomplete and insufficient."

78. Three months after BOEMRE issued the Final EIS, on April 22, 2009, BOEMRE responded to the ACHP's April 1, 2009 letter, noting that "[o]ne specific Traditional Cultural Property was identified" to BOEMRE during a separate 2008 meeting with the Tribe, and BOEMRE had evaluated this property as eligible for listing in the National Register. The letter noted that this Traditional Cultural Property "also has a view of the proposed project; therefore, it was included in the list of historic properties that would have an adverse effect from the proposed project."

79. On April 28, 2009, BOEMRE convened its third Section 106 consultation meeting, in Hyannis, Massachusetts, where the Tribe's THPO expressed concern that consultation had not been sufficient.

80. On June 12, 2009, BOEMRE responded to the Massachusetts Historical Commission's letter of February 6, 2009, four months prior, noting, without explanation, that "we respectfully disagree" that the Finding document was "incomplete and insufficient."

81. BOEMRE convened its fourth Section 106 consultation meeting in Hyannis, Massachusetts on June 16, 2009. There, BOEMRE distributed a draft Memorandum of Agreement and solicited comments from the consulting parties.

82. At the June 16, 2009 meeting, the Tribe's THPO again participated, this time questioning why BOEMRE had not considered determining the eligibility of Nantucket Sound for listing in the National Register, and why these considerations were not taken into account before selecting Horseshoe Shoal as the preferred Project location.

83. On June 23, 2009, the ACHP wrote to BOEMRE for the third time since consultation had begun, urging the agency to fulfill its Section 106 responsibilities and specifically, to address the following issues:

> First, the question of the National Register eligibility of Nantucket Sound as a traditional cultural place needs to be resolved. . . . Finally, we understand that the Wampanoag Tribe of Gay Head Aquinnah and the Mashpee Wampanoag Tribe both raised the issue of additional historic properties of significance to them. We recommend that [BOEMRE] elicit sufficient information from the Tribes regarding these properties so that their National Register eligibility can be resolved and so they can be given the appropriate consideration during the Section 106 review.

84. Also on June 23, 2009, the Tribe's Chairwoman wrote to the BOEMRE Project Manager, noting that "the Nantucket Sound viewscape is essential to our spiritual well-being and the Cape Wind Project will destroy this sacred site. . . . To date [BOEMRE] has not come to Martha's Vineyard to view the project from the vantage point of the viewscape that Cape Wind will destroy. [BOEMRE] came to our reservation, located at the western end of the Island and made an incorrect assumption that because the wind farm could not be seen from our reservation, it would have no adverse effect on our People or their culture."

85. On August 3 and 4, 2009, BOEMRE met with the Tribe and visited the Tribe's historic and sacred sites. As a result of those meetings, BOEMRE became aware of other tribal sacred and historic sites that are eligible for listing in the National Register and that the Project could be viewed from these sites.

86. On September 8, 2009, BOEMRE wrote a joint formal letter to the Tribe, the Mashpee Tribe, the ACHP, the Massachusetts Historical Commission, and the National Park Service, inviting and strongly urging all parties to attend a full Section 106 consultation meeting to finalize the Memorandum of Agreement distributed at the June 16 meeting. Although BOEMRE originally scheduled a meeting for September 30, 2009, no further meetings among consulting parties were held until Secretary Salazar convened the parties on January 13, 2010.

87. On September 17, 2009, the Tribe submitted a letter to the Keeper of the National Register, an office within the National Park Service, requesting an official determination of eligibility of the eastern view over Nantucket Sound for inclusion in the National Register, explaining that the Tribe considered the viewshed a Traditional Cultural Property.

88. On October 6, 2009, BOEMRE issued its "National Register Eligibility Determination for Nantucket Sound as a Traditional Cultural Property and Historic Property," in which the agency concluded that Nantucket Sound is not eligible for listing in the National Register.

89. On October 9, 2009, BOEMRE submitted its determination that Nantucket Sound was not eligible for listing in the National Register to the Massachusetts Historical Commission.

90. It is the role of the Massachusetts Historical Commission, as the Office of the SHPO, to prepare an independent opinion regarding the National Register-eligibility of a property based on factual research sources in archaeology, history, and ethnography.

91. On November 5, 2009, the Executive Director of the Massachusetts Historical Commission sent a letter to BOEMRE, in which he disagreed with BOEMRE's finding and

concluded that "Nantucket Sound is a Wampanoag Traditional Cultural Property that meets the Criteria of Eligibility (36 C.F.R. Part 60) for listing in the National Register of Historic Places under Criteria A, B, C, and D at the local level of significance."

92. The Massachusetts Historical Commission simultaneously issued its Opinion of Eligibility, noting that "[a] major scientific discovery in Nantucket Sound was made during archeological survey for the Cape Wind Energy Project and during previous geological studies" and that this discovery historically confirmed the Tribe's oral history that Nantucket Sound is a former habitation site and likely burial ground.

93. BOEMRE submitted a request for a determination of National Register-eligibility of Nantucket Sound to the Keeper of the National Register on November 18, 2009. BOEMRE submitted this request in response to the lack of agreement among BOEMRE, the Massachusetts Historical Commission, the Tribe, and the Mashpee Tribe over the Sound's eligibility for listing in the National Register.

94. On January 4, 2010, the Keeper of the National Register issued its official Determination of Eligibility Notification, in which the Keeper fully concurred with the Massachusetts Historical Commission that all of Nantucket Sound, including its surrounding islands and landforms, is eligible for listing in the National Register as a Traditional Cultural Property under all four of the possible criteria for listing.

95. In the Determination of Eligibility Notification, the Keeper found:

a.   "Nantucket Sound is eligible for listing in the National Register as a traditional cultural property and as an historic and archeological property that has yielded and has the potential to yield important information about the Native American exploration and settlement of Cape Cod and the Islands.

b. Neither the size of the Sound nor the fact that it is a body of water disqualify it from being found eligible for listing in the National Register.

c. The Sound is a key definer of the Wampanoag Tribes' place on and relationship with the earth.

d. The Sound itself maintains a high degree of overall integrity as an integral part of a district whose boundaries have not been precisely defined [because]. . . the Sound remains much as it has for hundreds of years.

e. Recent sampling projects in the Sound have uncovered new and highly significant additional evidence of intact, ancient, terrestrial soils including preserved wood, charcoal, plants, and seeds."

96. On January 4, 2010, Secretary Salazar issued a statement in response to the Keeper's determination in which he noted:

> [A]s we begin to develop [offshore wind] resources, we must ensure that we are doing so in the right way and in the right places. The Keeper's finding that Nantucket Sound is eligible for listing in the National Register provides information that will help us to undertake final consultations and analysis of potential impacts of wind development on historic and cultural resources in Nantucket Sound. After several years of review, it is now time to move the Cape Wind proposal to a final decision point.

97. Secretary Salazar convened a final Section 106 consultation meeting in Washington, D.C. on January 13, 2010, which the Tribe and other consulting parties attended.

98. On that same day, January 13, 2010, BOEMRE issued a Revised Documentation of Section 106 Finding of Adverse Effect ("Revised Finding") acknowledging additional adverse effects of the Project on historic and cultural properties. The Revised Finding acknowledged that the Project will have a direct adverse affect on the integrity of Nantucket Sound, a Traditional Cultural Property of the Tribe. In addition to alterations to the visual setting, the

Revised Finding recognized that the Project's physical disturbance of the seabed "will adversely impact the integrity of setting, feeling, and association and will forevermore undermine the undefiled nature of this [Traditional Cultural Property] of the Wampanoag Tribes in a direct and physical manner."

99.   The Revised Finding also noted that, during visits with the Tribe in August 2009, BOEMRE was made aware of two onshore sites located within the Project's Area of Potential Effect that are eligible for inclusion in the National Register, and that these Traditional Cultural Properties "have been added to the list of historic properties that would suffer adverse indirect visual effects from the proposed project."

100. The ACHP wrote to BOEMRE on January 20, 2010, urging BOEMRE to "ascertain the tribes' assessment of the revised finding and their opinion as to whether there are acceptable mitigation measures that could be included in the final [Memorandum of Agreement]."

101. In a January 29, 2010 letter from the Tribe to Secretary Salazar, the Tribe expressed concern that the Revised Finding of Adverse Effect did not adequately consider the Keeper's determination of eligibility, and that the timeline for approving the Project was not adequate to address the Tribes' continuing concerns.

102. On March 1, 2010, less than two months after BOEMRE had issued the Revised Finding, Secretary Salazar announced he was terminating Section 106 consultation with the Tribe and other consulting parties on the ground that the consulting parties could not reach agreement on suitable mitigation for the direct and indirect adverse effects of the Project.

103.   In accordance with the regulations, Secretary Salazar requested comments from the ACHP on the Project on March 1, 2010.

104. Just three days later, and before receiving the ACHP's comments, BOEMRE publicly noticed the availability of a Draft Environmental Assessment ("EA") and Finding of No New Significant Impact on March 4, 2010. BOEMRE solicited public comments on the Draft EA no later than April 7, 2010.

105. BOEMRE prepared the Draft EA to consider information that had become available since the Final EIS was issued in January 2009 and determine whether this information warranted the preparation of a Supplemental EIS.

106. In response to Secretary Salazar's request for comments, the ACHP Chairman appointed a panel of five ACHP members to consider the Project, in accordance with NHPA regulations. On March 22, 2010, the panelists conducted a site visit and held a public meeting on Cape Cod for the Section 106 consulting parties.

107. The Tribe testified at this hearing, again expressing the Tribe's concern that locating the Project on Horseshoe Shoal will destroy the sacred religious and cultural practices that the Tribe has engaged in for centuries.

108. On April 2, 2010, the ACHP submitted its formal comments to Secretary Salazar, in which the ACHP concluded:

a. "The altered view of the eastern horizon across Nantucket Sound that would result from the Project will have a significant adverse effect to the Wampanoag tribes' traditional cultural practices as carried out in relation to six eligible [Traditional Cultural Properties].

b. The Project would result in physical destruction, damage, and alteration of part of the seabed of Nantucket Sound . . . some of these adverse effects would be permanent, unavoidable, and not subject to satisfactory mitigation.

c.  The Project's effects on this broad range of properties should not be viewed in isolation or labeled only as indirect or direct.  Rather, because of their concentration and interrelation, they must also be considered together.  In their totality, these effects are significant, adverse and cannot be adequately mitigated.

d.  Approving the development of a large scale industrial facility as proposed is inconsistent with the policies and admonitions of NHPA and Executive Order 13287.

e.  The Section 106 review was not initiated in earnest during the scoping process for National Environmental Policy Act (NEPA) compliance, prior to investment of time, money, and extensive planning for the preferred location.

f.  Tribal consultation under Section 106 as conducted by the Corps and by [BOEMRE] was tentative, inconsistent, and late.

g.  The archaeological survey effort does not provide adequate data to enable modifications to the Project, were it to be approved, to avoid adverse effects or to inform appropriate mitigation.

h.  The ACHP recommends that the Secretary not approve the Project."

109.  On April 7, 2010, the Tribe's THPO wrote to Secretary Salazar expressing concern that the Tribe had been marginalized during the Section 106 process and asking that Secretary Salazar not approve the Project.

110.  On April 28, 2010, Secretary Salazar sent a letter to the ACHP responding to its formal comments, in which he concluded that, notwithstanding the ACHP's findings, "the public benefits support approval of the Project at the Horseshoe Shoal location."  The Secretary further maintained that "the tribal consultation process and the historic preservation-related

discussions, begun in 2005, have been the primary focus of attention for the entire Department over nearly the past year."

111. On the same day, April 28, 2010, Secretary Salazar signed and publicly released a Record of Decision ("ROD") under NEPA, approving BOEMRE's selection of Horseshoe Shoal as the Project site and authorizing BOEMRE to prepare a lease for the Project.

112. Also on April 28, 2010, BOEMRE issued the Final 2010 EA and a Finding of No New Significant Impact on the Project, concluding that there were no changes to the Project or new information that would require further analysis under NEPA.

113. The Final 2010 EA concludes that the new information regarding cultural resources does not significantly differ from the information discussed in the Final EIS, and no Supplemental EIS is warranted, nor does any new information "necessitate a re-analysis of the range of alternatives or the kinds, levels or locations of impacts by the Project upon biological, socioeconomic, or cultural resources."

114. The Final 2010 EA also states that the new information "does not alter the validity of the analysis in the Final EIS" and the "analysis, potential impacts, and conclusions detailed in the Final EIS remain applicable and unchanged."

115. The conclusions in the Final 2010 EA do not mention or respond to the ACHP's formal comments or mention Secretary Salazar's response to those comments.

116. On October 6, 2010, Secretary Salazar signed a 33-year lease with Cape Wind Associates to develop the Project.

117. On October 9, 2010, Cape Wind Associates submitted a COP for the Project to BOEMRE, as required by the Outer Continental Shelf Lands Act's implementing regulations, 30 C.F.R. § 285.105.

118. On February 4, 2011, Cape Wind Associates submitted a Revised COP for the Project to BOEMRE.

119. BOEMRE posted a "Notice of Preparation of an Environmental Assessment" on its website on February 22, 2011 to solicit public input regarding the Revised COP.

120. In its Notice of Preparation, BOEMRE stated that it was preparing a second EA to determine whether there were any significant impacts associated with the COP that had not been discussed in the Final EIS or Final 2010 EA.

121. On March 9, 2011, the Tribe's THPO wrote to BOEMRE raising a number of concerns and urging BOEMRE to prepare a Supplemental EIS to account for changes to the Project. The letter asserted that BOEMRE had not properly noticed the availability of the Revised COP or the preparation of an EA, and had allowed only fourteen days to review the nine-hundred-page Revised COP to determine what issues BOEMRE should address in an EA. The THPO requested a minimum sixty-day public comment period. The letter also reiterated the Tribe's position that adequate Section 106 consultation had not yet occurred.

122. BOEMRE issued a second EA and Finding of No New Significant Impact on April 18, 2011 ("Final 2011 EA"), concluding that all impacts associated with Cape Wind Associate's Revised COP had been properly examined in the Final EIS.

123. The Final 2011 EA contained no mention of Tribal interests or properties of cultural or historic concern, nor did it mention the ACHP's April 2, 2010 comments or the Keeper's Determination of Eligibility.

124. On that same day, April 18, 2011, BOEMRE issued another ROD ("2011 ROD") approving the Revised COP.

125.  The 2011 ROD noted that, although the lease specifies that the appropriate buffer zone around potential cultural resources is one-hundred feet, BOEMRE reserves the right to adjust the buffer zone.

126.  In April 2011, Cape Wind Associates updated its COP by incorporating the conditions contained in the 2011 ROD.

## CLAIMS FOR RELIEF

### Count 1

**Failure to Adequately Analyze Environmental Impacts in Violation of the National Environmental Policy Act & the Administrative Procedure Act**

127.  The Tribe repeats and incorporates by reference all preceding paragraphs.

128.  The Final EIS is inadequate under NEPA and its implementing regulations because it does not adequately address the Project's potential impact on the Tribe or on the Tribe's Traditional Cultural Properties.  42 U.S.C. §§ 4321 *et seq.*; 40 C.F.R. §§ 1500-1508.

129.  The Final EIS is inadequate under NEPA and its implementing regulations because it does not adequately address the Project's potential impact on the Tribe's practice of subsistence fishing.  42 U.S.C. §§ 4321 *et seq.*; 40 C.F.R. §§ 1500-1508.

130.  Defendants' issuance of the 2011 ROD approving Cape Wind's COP despite the inadequacy of the Final EIS violates NEPA and its implementing regulations and is arbitrary, capricious, and not in accordance with law, in violation of the Administrative Procedure Act ("APA").  42 U.S.C. §§ 4321 *et seq.*; 40 C.F.R. §§ 1500-1508; 5 U.S.C. § 706(2)(A).

### Count 2

**Failure to Supplement the Final Environmental Impact Statement in Violation of the National Environmental Policy Act & the Administrative Procedure Act**

131.  The Tribe repeats and incorporates by reference all preceding paragraphs.

132. Defendants violated NEPA and its implementing regulations when it failed to supplement the Final EIS or take a "hard look" to determine whether a Supplemental EIS was necessary, despite evidence in the record showing that the impact to the Tribe's Traditional Cultural Property would be greater than that anticipated in the Final EIS. 42 U.S.C. §§ 4321 *et seq.*; 40 C.F.R. §§ 1500-1508.

133. In failing to supplement the Final EIS to reflect the determinations, comments, and findings of the Massachusetts SHPO, the Keeper of the National Register, and the ACHP, Defendants have not satisfied their duty to discuss the direct effects of the proposed action, in violation of NEPA and its implementing regulations. 42 U.S.C. §§ 4321 *et seq.*; 40 C.F.R. §§ 1500-1508.

134. Defendants' issuance of the 2011 ROD despite their failure to prepare a Supplemental EIS violates NEPA and its implementing regulations and is arbitrary, capricious, and not in accordance with law, in violation of the APA. 42 U.S.C. §§ 4321 *et seq.*; 40 C.F.R. §§ 1500-1508; 5 U.S.C. § 706(2)(A).

## Count 3

**Failure to Adequately Assess Impacts on Traditional Cultural Properties in Violation of the National Historic Preservation Act & the Administrative Procedure Act**

135. The Tribe repeats and incorporates by reference all preceding paragraphs.

136. Defendants violated their duty under NHPA and its implementing regulations by selecting Horseshoe Shoal as the preferred Project location before engaging in meaningful and adequate Section 106 consultation with the Tribe. 16 U.S.C. §§ 470 *et seq.*; 36 C.F.R. pt. 800.

137. Defendants violated their mandatory duty under NHPA and its implementing regulations to complete the Section 106 process before conducting project planning activities that would subsequently restrict the consideration of alternatives to avoid, minimize, or

mitigate the Project's adverse effects on historic properties.  16 U.S.C. §§ 470 *et seq.*; 36 C.F.R. pt. 800.

138.  Defendants violated their mandatory duty under NHPA and its implementing regulations to initiate Section 106 consultation early in the Project's planning so that a broad range of alternatives may be considered during this process.  16 U.S.C. §§ 470 *et seq.*; 36 C.F.R. pt. 800.

139.  Defendants violated their mandatory duty under NHPA and its implementing regulations to ensure that Section 106 consultation provides a reasonable opportunity for the Tribe to identify and advise on its concerns about historic properties, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects.  16 U.S.C. §§ 470 *et seq.*; 36 C.F.R. pt. 800.

140.  Defendants violated their mandatory duty under NHPA and its implementing regulations to recognize the formal government-to-government relationship between the federal government and Indian Tribes, and conduct consultation in a manner respectful of tribal sovereignty and sensitive to the concerns and needs of Indian tribes, by failing to engage the Tribe in meaningful Section 106 consultation.  16 U.S.C. §§ 470 *et seq.*; 36 C.F.R. pt. 800.

141.  Defendants violated their mandatory duty under 36 C.F.R. § 800.3(c) to "consult with the SHPO or THPO in a manner appropriate to the agency planning process for the undertaking and to the nature of the undertaking and its effects on historic properties" by failing to officially initiate the Section 106 consultation process until July of 2008, six months after BOEMRE had issued the Draft EIS, and six months before BOEMRE issued the Final EIS.

142. Defendants violated their mandatory duty under 36 C.F.R. § 800.4(b) to take into account any confidentiality concerns raised by the Tribe by not providing an adequate and confidential opportunity for the Tribe to communicate its concerns about historic properties during their initial contact with the Tribe.

143. Defendants' issuance of the 2011 ROD despite their failure to conduct meaningful, early, and confidential consultation with the Tribe violates NHPA and its implementing regulations and is arbitrary, capricious, and otherwise not in accordance with law, in violation of the APA.  16 U.S.C. §§ 470 *et seq.*; 36 C.F.R. pt. 800; 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

The Tribe seeks the following relief:

1. A declaration that Defendants issued the 2011 ROD approving Cape Wind Associate's COP in violation of NEPA, NHPA, and the APA.

2. An injunction requiring Defendants to withdraw the 2011 ROD and not re-issue a ROD until Defendants' violations of federal law have been remedied.

3. An injunction requiring Defendants to prepare a Supplemental EIS  before issuing a ROD approving Cape Wind Associate's COP.

4. An award to the Tribe of all costs and expenses related to this action, including reasonable attorneys' fees, under the Equal Access to Justice Act, 28 U.S.C. § 2412.

5. All other appropriate relief.


DATED: July 06, 2011

Respectfully Submitted,

_____
Kelly D. Davis (D.C. Bar No. 998793)


_____
Margie Sollinger (D.C. Bar No. 976308)

Institute for Public Representation
Georgetown University Law Center
600 New Jersey Ave. NW, Suite 312
Washington, D.C. 20001-2075
Tel:  202-662-9535
Fax: 202-662-9634
kdd33@law.georgetown.edu
mjs289@law.georgetown.edu

*Counsel for Wampanoag Tribe of Gay Head (Aquinnah)*